Justice Stevens,
dissenting.
While I join Justice Breyer’s cogent dissent, I think it important to emphasize two flaws in the Court’s reasoning. Apparently assuming that the Federal Communications Commission’s (FCC or Commission) rulemaking authority is a species of executive power, the Court espouses the novel proposition that the Commission need not explain its decision to discard a longstanding rule in favor of a dramatically different approach to regulation. See ante, at 514-515. Moreover, the Court incorrectly assumes that our decision in FCC v. Pacifica Foundation, 438 U. S. 726 (1978), decided that the word “indecent,” as used in 18 U. S. C. § 1464,[1] permits the FCC to punish the broadcast of any expletive that has a sexual or excretory origin. Pacifica was not so sweeping, and the Commission’s changed view of its statutory mandate certainly would have been rejected if presented to the Court at the time.
I
“The structure of our Government as conceived by the Framers of our Constitution disperses the federal power among the three branches — the Legislative, the Executive, and the Judicial — placing both substantive and procedural limitations on each.” Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc., 501 U. S. 252, 272 (1991). The distinction among the branches is not always sharp, see Bowsher v. Synar, 478 U. S. 714, 749 (1986) (Stevens, J., concurring in judgment) (citing cases), a consequence of the fact that the “great ordinances of the Constitution do not establish and divide fields of black *540 and white,” Springer v. Philippine Islands, 277 U. S. 189, 209 (1928) (Holmes, J., dissenting). Strict lines of authority are particularly elusive when Congress and the President both exert a measure of control over an agency. As a landmark decision involving the Federal Trade Commission (FTC) made clear, however, when Congress grants rule-making and adjudicative authority to an expert agency composed of commissioners selected through a bipartisan procedure and appointed for fixed terms, it substantially insulates the agency from executive control. See Humphrey’s Executor v. United States, 295 U. S. 602, 623-628 (1935).
With the view that broadcast regulation “should be as free from political influence or arbitrary control as possible,” S. Rep. No. 772, 69th Cong., 1st Sess., 2 (1926), Congress established the FCC with the same measure of independence from the Executive that it had provided the FTC. Just as the FCC’s Commissioners do not serve at the will of the President, see 47 U. S. C. § 154(c) (2000 ed.), its regulations are not subject to change at the President’s will. And when the Commission fashions rules that govern the airwaves, it exercises legislative power delegated to it by Congress. See Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 489-490 (2001) (Stevens, J., concurring in part and concurring in judgment); Bowsher, 478 U. S., at 752 (opinion of Stevens, J.). Consequently, the FCC “cannot in any proper sense be characterized as an arm or an eye of the executive” and is better viewed as an agent of Congress established “to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative . . . aid.” Humphrey’s Executor, 295 U. S., at 628.[2]
*541 The FCC, like all agencies, may revise its regulations from time to time, just as Congress amends its statutes as circumstances warrant. But the FCC is constrained by its congressional mandate. There should be a strong presumption that the FCC’s initial views, reflecting the informed judgment of independent Commissioners with expertise in the regulated area, also reflect the views of the Congress that delegated the Commission authority to flesh out details not fully defined in the enacting statute. The rules adopted after Pacifica, 438 U. S. 726, have been in effect for decades and have not proved unworkable in the intervening years. As Justice Breyer’s opinion explains, broadcasters have a substantial interest in regulatory stability; the threat of crippling financial penalties looms large over these entities. See post, at 556-561. The FCC’s shifting and impermissibly vague indecency policy only imperils these broadcasters and muddles the regulatory landscape. It therefore makes eminent sense to require the Commission to justify why its prior policy is no longer sound before allowing it to change course.[3] *542 The FCC’s congressional charter, 47 U. S. C. § 151 et seq., the Administrative Procedure Act, 5 U. S. C. § 706(2)(A) (2006 ed.) (instructing courts to “hold unlawful and set aside . . . arbitrary [or] capricious” agency action), and the rule of law all favor stability over administrative whim.
II
The Court commits a second critical error by assuming that Pacifica endorsed a construction of the term “indecent,” as used in 18 U. S. C. § 1464, that would include any expletive that has a sexual or excretory origin. Neither the opinion of the Court, nor Justice Powell’s concurring opinion, adopted such a far-reaching interpretation. Our holding was narrow in two critical respects. First, we concluded, over the dissent of four Justices, that the statutory term “indecent” was not limited to material that had prurient appeal and instead included material that was in “nonconformance with accepted standards of morality.” Pacifica, 438 U. S., at 740. Second, we upheld the FCC’s adjudication that a 12-minute, expletive-filled monologue by satiric humorist George Carlin was indecent “as broadcast.” Id., at 735. We did not decide whether an isolated expletive could qualify as indecent. Id., at 750; id., at 760-761 (Powell, J., concurring in part and concurring in judgment). And we certainly did not hold that any word with a sexual or scatological origin, however used, was indecent.
The narrow treatment of the term “indecent” in Pacifica defined the outer boundaries of the enforcement policies adopted by the FCC in the ensuing years. The Commission originally explained that “under the legal standards set forth in Pacifica, deliberate and repetitive use [of expletives] in a *543 patently offensive manner is a requisite to a finding of indecency.” In re Pacifica Foundation, 2 FCC Red. 2698,2699, ¶ 13 (1987). While the “repetitive use” issue has received the most attention in this case, it should not be forgotten that Pacifica permitted the Commission to regulate only those words that describe sex or excrement. See 438 U. S., at 743 (plurality opinion) (“[T]he Commission’s definition of indecency will deter only the broadcasting of patently offensive references to excretory and sexual organs and activities” (emphasis added)). The FCC minimizes the strength of this limitation by now claiming that any use of the words at issue in this case, in any context and in any form, necessarily describes sex or excrement. See In re Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002 and Mar. 8,2005,21 FCC Red. 13299,13308, ¶ 23 (2006) (Remand Order) (“[A]ny strict dichotomy between expletives and descriptions or depictions of sexual or excretory functions is artificial and does not make sense in light of the fact that an expletive’s power to offend derives from its sexual or excretory meaning” (internal quotation marks omitted)). The customs of speech refute this claim: There is a critical distinction between the use of an expletive to describe a sexual or excretory function and the use of such a word for an entirely different purpose, such as to express an emotion. One rests at the core of indecency; the other stands miles apart. As any golfer who has watched his partner shank a short approach knows, it would be absurd to accept the suggestion that the resultant four-letter word uttered on the golf course describes sex or excrement and is therefore indecent. But that is the absurdity the FCC has embraced in its new approach to indecency.[4] See In re Complaints Against Vari *544 ous Broadcast Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 19 FCC Rcd. 4975, 4978-4979, ¶¶8-9 (2004) (declaring that even the use of an expletive to emphasize happiness “invariably invokes a coarse sexual image”).
Even if the words that concern the Court in this case sometimes retain their sexual or excretory meaning, there are surely countless instances in which they are used in a manner unrelated to their origin. These words may not be polite, but that does not mean they are necessarily “indecent” under §1464. By improperly equating the two, the Commission has adopted an interpretation of “indecency” that bears no resemblance to what Pacifica contemplated.[5] Most distressingly, the Commission appears to be entirely unaware of this fact, see Remand Order, 21 FCC Red., at 13308 (erroneously referencing Pacifica in support of its new policy), and today's majority seems untroubled by this significant oversight, see ante, at 508-510, 517-518. Because the FCC has failed to demonstrate an awareness that it has ventured far beyond Pacifica's reading of § 1464, its policy choice must be declared arbitrary and set aside as unlawful. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U. S. 402, 416 (1971).
Ill
For these reasons and those stated in Justice Breyer’s dissenting opinion, I would affirm the judgment of the Court of Appeals.

 Section 1464 provides: “Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined under this title or imprisoned not more than two years, or both.”

Justice Scalia erroneously concludes that treating the FCC’s rule-making authority as an exercise of legislative power would somehow be unconstitutional. See ante, at 524 (citing Bowsher v. Synar, 478 U. S. 714, *541 726 (1986)). But that is the nature of rulemaking: Rules promulgated by agencies (independent or not) carry the force of law precisely because they are exercises of such legislative authority. This may offend Justice Scalia’s theory of the “unitary Executive,” ante, at 526, but it does not offend the Constitution. Indeed, “the Framers vested ‘All legislative Powers’ in the Congress, Art. I, § 1, just as in Article II they vested the ‘executive Power’ in the President, Art. II, § 1. Those provisions do not purport to limit the authority of either recipient of power to delegate authority to others.” Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 489 (2001) (Stevens, J., concurring in part and concurring in judgment).

 It appears that Justice Scalia has come to the view that isolated statements by members of a congressional oversight subcommittee are sufficient evidence of Congress’ intent. See ante, at 523-524, n. 4. Delving into the details of how various lawmakers “grilled” the foil slate of FCC Commissioners, Justice Scalia concludes, quite remarkably, that this encounter “made clear [Congress’] wishes for stricter enforcement” and “would seem an adequate explanation of [the FCC’s] change of posi *542 tion.” Ante, at 524-525. Putting to the side the question whether congressional outrage is the kind of evidence sufficient to explain the Commission's decision to adopt a thinly reasoned and unconstitutional policy, Justice Scaua’s treatment of these proceedings as evidencing the intent of Congress would make even the most ardent student of legislative history blush.

 It is ironic, to say the least, that while the FCC patrols the airwaves for words that have a tenuous relationship with sex or excrement, commercials broadcast during prime-time hours frequently ask viewers whether they too are battling erectile dysfunction or are having trouble going to the bathroom.

 While Justice Thomas and I disagree about the continued wisdom of Pacifica, see ante, p. 530 (concurring opinion), the changes in technology and the availability of broadcast spectrum he identifies certainly counsel a restrained approach to indecency regulation, not the wildly expansive path the FCC has chosen.