LUCERO, Circuit Judge,
dissenting.
I agree with my respected colleagues that special masters are “agency personnel” under the Federal Records Act (“FRA” or “Act”). But I disagree that unfiled depositions taken in private litigation fall within the ambit of the FRA. Neither Congress, the National Archives and Records Administration (“NARA”), nor the Administrative Office of the United States Courts understand the FRA to direct federal courts to transfer any discovery documents deposited with a special master to the National Archives. The majority’s decision is contrary to the clear meaning of the FRA and, under the facts of this case, contrary to the expectations of parties litigating under the Federal Rules of Civil Procedure. Thus, I must respectfully dissent.
The FRA directs federal agencies to preserve records that document their “organization, functions, policies, decisions, procedures, and essential transactions.” 44 U.S.C. § 3101. By doing so, agencies “document[ ] ... the policies and transactions of the Federal Government.” § 2902(1). Simply stated, the depositions of Wayne and Katherine Harris and Susan and Thomas Klebold do not document the organization, functions, policies, decisions, procedures, or essential transactions of the federal courts. In defining “record” without proper concern for the context provided by §§ 2902 and 3101, the majority’s interpretation of the statute is jarringly inconsistent with both the text and purpose of the FRA.[1]
In addition, the majority’s interpretation thwarts the expectations of parties in discovery proceedings under the Federal Rules of Civil Procedure. Parties depose witnesses to obtain information and compile evidence in aid of litigation. They do not do so to create, nor did the parties here actually create, a historical record of the federal judiciary. When the depositions at issue were placed in the evidence room, that act alone did not create a federal record under the FRA. This expectation is common to private litigants and was confirmed by the protective orders entered by the court. Moreover, we should not assume that Congress intended to upset the reasonable expectations of litigants in the absence of a clear statement to the contrary.
I
A
As the FRA’s text and structure specify, the role of agencies under the Act is to manage their own records, not to archive private documents, regardless of their historical value. Under the Act, agencies *1323 must ensure that they “make and preserve” only those records that contain information regarding the government’s “organization, functions, policies, decisions, procedures, and essential transactions,” § 3101; see also Federal Records Act of 1950, Pub.L. No. 81-754, § 506(a), 64 Stat. 578, 586 (1950), none of which is implicated by the depositions in the case at bar. The majority lights upon the phrase “informational value,” Maj. Op. at 1317, which appears in the definition of “records” found at 44 U.S.C. § 3301 but is conspicuously absent from § 3101. By doing so, the majority expands the role of agencies to include the preservation of materials that do not document the government’s organization, functions, policies, decisions, procedures, or essential transactions. This mistake contravenes the objective of the FRA: to “establish[ ] ... standards and procedures to assure efficient and effective records management,” § 2902, so that records of “the policies and transactions of the Federal Government” are accurate and complete, easily used, and judiciously created and preserved, see § 2902(l)-(6).
By relying solely on the definition of “records” in § 3301, the majority effectively excises important guidance regarding agencies’ preservation duties. Section 3101 explicitly specifies which records are subject to these duties. Nonetheless, the majority reads the broader definition of “records” in § 3301 as controlling over the more specific preservation rule articulated in § 3101. This is contrary to accepted principles of statutory interpretation. See Gozlon-Peretz v. United States, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) (“A specific provision controls over one of more general application.” (citation omitted)); Franklin v. United States, 992 F.2d 1492, 1502 (10th Cir.1993) (“[A] specific statute ... should not be deemed controlled or nullified by a general statute ... absent a definite contrary intention.”).
Following these principles, § 3101 — not § 3301 — serves as my analytical starting point. Section 3101 provides:
The head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency’s activities.
§ 3101. I fail to see in this language a direction to the district courts to transfer discovery in private litigation to the National Archives. The depositions at issue do not document the categories described. In essence, the district court and the majority read out all but the first eleven words of § 3101. But it is the remainder of § 3101 that establishes an agency’s role under the FRA and answers the question before us.
The majority exclusively relies on the definition in § 3301, which provides, in relevant part:
“[Rjecords” includes all ... documentary materials ... made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.
§ 3301 (emphasis added). By taking a cut and paste approach, my colleagues conclude that the depositions at issue need not be “evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government,” id., *1324 because of their conclusion that a document may also qualify as a record if it contains data with “informational value.” Maj. Op. at 1317 (“[T]he depositions in this case qualify as records if they were (1) made or received by the court, and (2) preserved by the court or appropriate for preservation because they are evidence of government performance or because they contain other information of value.” (emphasis added)). The district court similarly interpreted this clause to expand the role of an agency to include the preservation of records which merely have “informational value,” despite the express guidance in § 3101 that each agency “shall make and preserve” only those which “contain[ ] adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency,” § 3101. See Apr. 2, 2007 Order, Rohrbough v. Harris, No. 00-cv-00808-LTB-PAC, 2007 WL 987848, at *4 (D.Colo. Apr.2, 2007) (“I conclude that the materials relating to the depositions ... fall within the definition of records under the FRA. These materials were received and stored by the Court, and they are of significant historical value.” (emphasis added)).
I cannot agree with this interpretation. In § 3101, Congress explicitly addressed what records agencies should “make and preserve” and excluded the informational value clause present in § 3301.[2] The broad definition of “records” analyzed by the majority appears in the chapter entitled “Disposal of Records.” 44 U.S.C. ch. 33. This context illuminates the meaning of the term “informational value”: it allows for the preservation of materials that would otherwise be disposed of because they no longer document “the organization, functions, policies, decisions, procedures, operations or other activities of the Government.” § 3101. This permits the preservation of records that are valuable because they document an agency’s history. Section 3303(2) confirms this. It directs each agency head to submit to the Archivist lists of records that may be disposed of, as they are “not needed by [the agency] in the transaction of its current business and ... do not appear to have sufficient administrative, legal, research, or other value to warrant their further preservation.” § 3303(2) (emphasis added). This provision plainly corresponds to the “informational value” provision in § 3301, and allows for an exception to the disposal of such records if they warrant further preservation once they cease to describe current agency activities.
Viewing the statutory scheme as a whole, an agency must originally preserve records only because they document its organization, functions, policies, decisions, procedures, and essential transactions— not merely because they have “informational value.”[3] Accordingly, this term is excluded from § 3101. By importing “informational value” into this context, the *1325 majority creates an artificial conflict between § 3101 and § 3301 and then allows the more general provision— § 3301 — to control.
The majority agrees that my interpretation “might be compelling if § 3101 were intended to establish the sole record-preservation duties of federal agencies.” Maj. Op. at 1319. Precisely because § 3101 is the sole section establishing agencies’ preservation duties, I read the statute to compel this conclusion. Section 3101 does not, as the majority implies, govern only records created by the agency. The majority claims that the “clear purpose” of § 3101 is to “ensure that agencies make adequate records,” Maj. Op. at 1319, and the section “mandates” that agencies “then retain those records,” id. (emphasis added). Such a reading does not interpret the text but rewrites it. The actual text, “[t]he head of each Federal agency shall make and preserve records,” § 3101 (emphasis added), does not limit its preservation “mandate” to only those records an agency “makes.” The plain text of § 3101 requires an agency to preserve records containing “documentation of [its] organization, functions, policies, decisions, procedures, and essential transactions” whether it made or received them. If there were any ambiguity in this text, my reading is confirmed by the title of the section: “Records management by agency heads; general duties.” § 3101 (emphasis added); see Whitman v. Am. Trucking Ass’ns, 531 U.S. 457, 483, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“[T]he interpretive role of the title” is to “shed light on some ambiguous word or phrase in the statute itself.” (quotation and alteration omitted)). Section 3101 establishes the complete and sole record creation and record preservation duties of federal agencies.
The majority further claims that 44 U.S.C. § 3314 establishes a preservation duty outside of § 3101 because it provides that “the procedures prescribed by [Chapter 33] are exclusive, and records of the United States Government may not be alienated or destroyed except under this chapter.” But the majority’s belief that § 3314 establishes a duty to preserve in addition to the duties established in § 3101 presupposes its own conclusion. Section 3314 only controls the disposal of the depositions if they are federal records. If they are not federal records, § 3314 does not apply to them. Thus, only by assuming that these unsigned, unfiled depositions are federal records can the majority possibly rely on § 3314. Because I do not assume this conclusion, § 3314 does not establish a preservation duty. Those duties are established solely by § 3101.
B
The genesis of the FRA was President Truman’s Executive Order No. 9784. See S.Rep. No. 81-2140, at 3547 (1950). Its purpose was “to provide that Government records may be utilized to maximum advantage and disposed of expeditiously when no longer needed and in the interest of more efficient internal management of the Government.” Exec. Order No. 9784, 11 Fed.Reg. 10909 (Sept. 27, 1946). The majority’s interpretation of the FRA not only ignores this focus on efficient disposal, reflected in § 3301, it contradicts it; under the majority’s approach, agencies must retain more, not less, of the paper that crosses their desks.
In 1976, Congress found that:
Because of the new utilization by the government since 1950 of advanced technologies ... the records production process has been speeded up .... [T]he amount of paper flowing into the government each year fills four and a half million cubic feet of space and ... the costs to the taxpayer of handling and *1326 managing such a mountain of paper exceed $8 billion a year.
S. Rep. 94-1326, at 2-3 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6150, 6151. Congress decided it was necessary to add Chapter 29, codifying the objectives of the FRA at 44 U.S.C. § 2902, to “provide a clear expression of Congressional intent to the heads of Federal departments and agencies on the necessity to place more emphasis on records management programs aimed at providing essential, accurate recorded information in the needed format and time frame to enable agencies to perform their functions effectively and efficiently.” S. Rep. 94-1326, at 3, U.S.Code Cong. & Admin.News 1976, pp. 6150, 6152.
Certainly, Congress was not oblivious to the possibility that records might have historical value, but it created a separate body, the National Historical Publications Commission (now the National Historical Publications and Records Commission), the appointed members of which are all historians, to preserve those with such value. Federal Records Act of 1950 § 503(a) (now codified as 44 U.S.C. § 2501(a)(2)). Notably, the Commission’s mandate is far broader than the duties of federal agencies that fall within the ambit of the FRA. The Commission is directed to “cooperate” with “State ... and local agencies and nongovernmental institutions, societies, and individuals” and may “edit[] and publish! ] papers of outstanding citizens of the United States, and other documents as may be important for an understanding and appreciation of the history of the United States.” § 2504(b).
Seen in context, the number of documents “made or received” by agency personnel is orders of magnitude greater than it was in 1976. Following the direction of Congress, I understand the FRA to restrict which records an agency preserves to only those that “contain[ ] adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency.” § 3101. The majority, on the other hand, has decided to expand its scope.
C
The operative question is whether the unfiled, unsigned depositions of Wayne and Katherine Harris and Susan and Thomas Klebold document “the organization, functions, policies, decisions, procedures, and essential transactions of the agency.” The majority errs in failing to answer that question before addressing whether the depositions were “made or received” by the special master, which appears to be the focus of their analysis. Maj. Op. at 1318-19.
1. “Organization”
The organization of the federal judiciary was not at issue in the appellants’ lawsuit. In the context of the federal judiciary, organizational records might document the structure of the lower courts, clerks’ offices, and judicial staff.[4] This lawsuit does implicate the structure and management of the courts. Although the depositions themselves are not before us, it is hard to imagine how the testimony of the parents of the Columbine shooters could document the manner in which the federal courts are organized.
2. “Functions”
The primary function of the federal judiciary is to decide cases and controversies. *1327 See U.S. Const, art. III, § 2. To achieve that primary function, the judiciary also has subsidiary functions such as resolving motions. Records describing the contours of these responsibilities or assigning them to court personnel would document the functions of the judiciary. For example, the protective order in this case is such a record because it appoints and describes the functions of the special master. Depositions of the private parties litigating this case, which were never filed nor were their contents considered by the court, do not document a judicial function.
3. “Policies”
A “policy” is “a definite course or method of action selected ... to guide and usually determine present and future decisions.” Webster’s Third New International Dictionary (Unabridged) 1754 (1993). The Administrative Office of the United States Courts documents the policies of federal courts in its Guide to Judiciary Policies and Procedures. Further policies are documented in each court’s local rules. To consider the Harris and Klebold depositions to constitute records that “guide and ... determine present and future decisions” of the federal courts strains credulity.
4. “Decisions”
The decisions of a federal court, unlike its organization, functions, or policies, may well turn on evidence produced in discovery. Motions for summary judgment, for example, rely on supporting exhibits such as depositions, even if the exhibits are not admitted at trial. Depositions used to resolve such motions could be said to document the decision of a court. Here, however, the contents of the Harris and Klebold depositions were never examined by the court and did not serve as the basis for any judicial decision. They were held in the evidence room simply as a consequence of the protective order, which required that “[depositions requiring the use of nonpublic protected documents shall be conducted at the Courthouse in the presence of the Special Master” (quotation omitted). Indeed, it would have been improper for the court to base a decision on their contents, as they were unsigned and never filed with the court. See Fed.R.Civ.P. 5(d)(1), 26(g). Consequently, the Harris and Klebold depositions do not document the decisions of any federal court.
5.“Procedures”
The procedures of the federal courts are closely related to their policies and are often similarly documented. Along with the Guide to Judiciary Policies and Procedures, courts’ procedures are also documented in their rules, such as the Federal Rules of Civil Procedure, the Federal Rules of Appellate Procedure, the Supreme Court rules, circuit rules, and other local rules. In a case challenging such procedural rules, depositions that a court substantively considers and relies on may arguably document its procedures. Because the Harris and Klebold depositions are not related to a challenge to any judicial procedure and the court never considered their contents, they do not document the procedures of the federal courts.
6.“Essential Transactions”
Finally, I turn to whether the depositions document the “essential transactions” of the judiciary. Essential transactions in a judicial context include receiving pleadings and documents filed with or presented as evidence to the Court (the “case file”), holding hearings and trials, entering orders, and issuing opinions. Accordingly, the majority is correct that documents *1328 filed with the clerk’s office are federal records. Maj. Op. at 1318. In contrast, unsigned depositions cannot be filed. See Fed.R.Civ.P. 5(d)(1), 26(g); Maj. Op. at 1318. Therefore, the Harris and Klebold depositions could not possibly document an essential transaction of the court because they were neither filed with the clerk’s office, used at a hearing or trial, nor were their contents relied upon by a judge.[5]
Because the depositions of Wayne and Katherine Harris and Susan and Thomas Klebold do not fall within any of the above categories, they do not fall within the ambit of the FRA. § 3101. It is unnecessary to reach whether they were “made or received” by the court.[6]
II
A
Beyond misinterpreting the statute, the majority’s conclusion interprets the FRA as throwing a wrench into discovery practice. The Federal Rules of Civil Procedure explicitly and precisely address how discovery materials are collected and used. See Fed.R.Civ.P. 26-36.[7] Today’s decision potentially exposes any discovery deposited with a special master to public inspection. I cannot read a vague, broadly-worded statute directed toward public agencies as having such a profound effect. See Canup v. Chipman-Union, Inc., 123 F.3d 1440,1443 (11th Cir.1997) (“We would expect Congress to speak more clearly if it intended such a radical change in the application and understanding of its ... statutes.”); In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1382 (5th Cir.1986) (“We think it unlikely that Congress would have adopted such a rule— entailing, as it does, major changes in the way in which a reorganization proceeding is conducted — without clear, unequivocal statements to that effect in the bankruptcy statute or, at the least, in its legislative history.”); Flynn v. U.S. ex rel. Eggers, 786 F.2d 586, 591 (3d Cir.1986) (“[W]e are *1329 mindful of the Supreme Court’s admonition that, absent a clear Congressional statement, we should not infer that Congress intended to alter equity practices.”).[8]
By holding that any document that passes through the hands of a special master may be transferred to the National Archives, the majority adds a new and unexpected variable into the calculus of litigation discovery. Until today, parties could confidently follow the Supreme Court’s command that “deposition-discovery rules are to be accorded a broad and liberal treatment,” Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947), safe in the knowledge that objectionable questions and answers would not be admitted at trial, see Fed.R.Civ.P. 30(c), and, if necessary, would be sealed for “good cause shown,” Fed.R.Civ.P. 26(c). In other words, taking or sitting for a deposition was confined to a particular lawsuit. No longer is this the case.
B
In addition to the broad expectations that the Federal Rules of Civil Procedure create, the district court below adhered to those rules and created specific expectations regarding the disclosure of discovery by entering several protective orders. See Fed.R.Civ.P. 26(c). The earliest protective order, issued on January 8, 2002, stated, “Promptly after the termination of this action ..., all Protected Documents, Confidential Information, and copies of deposition transcripts designated as confidential ... shall be returned to counsel for the party producing those confidential materials.” The final, consolidated protective order of April 25, 2003, in effect when Wayne and Katherine Harris and Susan and Thomas Klebold were deposed, and when the case was settled in August, provides that “[a]t the conclusion of this litigation, all documents and materials deposited in the Evidence Room pursuant to this Consolidated Protective Order shall be returned to the producing party, entity, or person or the appropriate custodian of any such documents and materials.” All parties to the litigation properly shared an understanding — confirmed by the court — that all confidential discovery would be returned to the producing parties.
The Attorney General of Colorado upset the apple cart with its September 23, 2003, motion to intervene. Although intervention was denied, the Attorney General was permitted to participate as amicus, primarily to address his concern that an expert in youth violence should be allowed access to the records. Regardless of the legitimacy of this interest, it was never embraced by the parties to this appeal nor is there any *1330 other reason they would have anticipated it when the depositions were taken.
C
Because of the expectations created by the Federal Rules of Civil Procedure and the court’s protective orders pursuant to the Rules, it is extremely unlikely that the parties ever considered that their depositions might be redirected to the National Archives. Moreover, although the National Archives contain depositions, see The National Archives, Archival Research Catalog, http://www.archives.gov/research/ arc/ (search for “deposition”) (last visited Oct. 10, 2008), these are from congressional hearings, executive investigations, cases where the United States or an officer thereof was a party, or cases raising issues of historical importance. E.g., National Archives, Archival Research Catalog, http://arcweb.archives.gov/ (search “Reagan and Poindexter”) (last visited Oct. 10, 2008) (deposition of Ronald Reagan in U.S. v. Poindexter)-, National Archives, Archival Research Catalog, http://arcweb. archives.gov/ (search “Stowe and Thomas”) (last visited Oct. 10, 2008) (deposition of Harriet Beecher Stowe in Stowe v. Thomas, 1 Pitts. 82, 23 F. Cas. 201 (1853)). Although the last category includes depositions taken in private litigation, the Archives contain only depositions that were actually part of the case file.[9]
The Administrative Office’s schedules do not contemplate archiving unfiled depositions, confirming that it shares the parties’ expectations regarding the scope of the FRA. See Admin. Office of the U.S. Courts, The Guide to Judiciary Policies and Procedures, vol. 1, ch. 12, pt. A, §§ 14-15, Record Management Policies (2002), available at http://jnet.ao.dcn/ Guide/Vrolume_l/Chapter_12/Part_A.html (scheduling the disposal of “Case Records” and “Case-Associated Records”). Records Disposition Schedule 2 describes “Case Records” as “[a]ll records resulting from the docketing and processing of a case in a court that pertain to that particular case.” Id. § 15(A) (emphasis added). Similarly, NARA, in its briefing to the district court, explained that “[t]here is no way for [it] to know whether any materials in the Evidence Room were quoted or cited in any motions or other papers .... As a result, it remains unclear at this time whether any of those materials were ‘used’ in the cases and thus should be considered ‘records’ subject to the FRA.” As the majority acknowledges, these depositions were never “used” by the court, Maj. Op. at 1318, and thus NARA’s reasoning confirms that they are not records subject to the FRA.
In all litigation, parties should be on notice of the extent to which discovery may become public. The Federal Rules of Civil Procedure anticipate and expressly address these concerns, creating justified expectations. See Fed.R.Civ.P. 26(c), 30(c). The majority assumes that Congress steamrolled over these detailed and specific rules with a statute covering all federal agencies that never once mentions litigation. Absent a clear statement of Congressional intent to dramatically alter civil discovery practice, I cannot agree with my colleagues that the depositions in this case are records subject to transfer to the National Archives.
Ill
Because my reading of the FRA directs the district court to preserve only those *1331 records that document the federal courts’ organization, functions, policies, decisions, procedures, and essential transactions, I cannot agree with the majority that the Act covers the unfiled, unsigned depositions of Wayne and Katherine Harris and Susan and Thomas Klebold. I respectfully dissent.

. The majority states that my dissent raises “several issues not presented by the Rohr-bough plaintiffs on appeal.” Maj. Op. at 1319. To the contrary, the plaintiffs directly argue that the proper construction of the statute is “to ensure that adequate documentation of the agency’s transactions is preserved,” citing §§ 3101 and 2902. Aplts. Opening Br. at 7.

. The original Federal Records Act of 1950 confirms that the contrast between the duties of agencies in § 3101 and the definition of "records” in § 3301 was intentional. Congress included the definition of the word “records,” containing the "informational value” clause, in the 1950 Act. Federal Records Act of 1950, Pub.L. No. 81-754, § 511(a), 64 Stat. 578, 589 (1950). In the same bill, Congress expressly spelled out the duties of agencies under the FRA but excluded the "informational value” clause. § 506 (now codified as 44 U.S.C. § 3101). Today's statute continues to reflect this distinction.

. The majority asserts that it is "not dispute[d] that the [historical value] requirement is met.” Maj. Op. at 1317. This may be so, but as noted supra n. 1, the issue of whether records which have historical value, yet do not document government activity, fall within the FRA in the first place is squarely before us. See Aplts. Opening Br. at 7.

. This list, along with the others in this section, contains only illustrative examples of what falls within each category enumerated in § 3101 as applied to the federal courts, and is not intended to be exhaustive.

. The majority states that it "would be inclined to say that the depositions in this case come within the category of records described by § 3101" because "the depositions were taken in [the special master’s] presence and he ruled on objections as they arose.” Maj. Op. at 1319. As discussed, supra §§ I.C.4 and I.C.6, the special master's presence alone does not make these depositions federal records. Whether the special master "ruled on objections as they arose” is a question of fact the district court did not address, and which does not appear in the briefing. The only point at which any party before this court argued that the special master ruled on objections came at oral argument, when counsel for the Harrises responded in the affirmative to the question of whether the special master "made rulings.” My interpretation relies on the text and structure of the statute, which was plainly misapplied by the district court. Unlike the majority, I will not make this non-record-supported factual finding on appeal.

. Because materials including in a filing with the court document an "essential transaction,” if the appellants had filed the deposition transcripts as a part of the record on appeal, their appeal would have been self-defeating.

.Fed.R.Civ.P. 26 (mandatory discovery obligations, scope and timing of discovery, supplementary disclosures, mandatory discovery conference, and signature requirement), 27 (perpetuated testimony), 28 (who must witness a deposition), 29 (stipulations in discovery practice), 30 (timing of oral depositions, written notice requirements, providing for production of documents via subpoena duces tecum, format of questioning, objection process during depositions, duration of depositions, certification requirements, and sanctions), 31 (procedure for taking written deposition), 32 (use of depositions in hearing or trial), 33 (interrogatories), 34 (production of documents or other electronic or tangible items), 35 (physical and mental examinations), 36 (scope and effect of requests for admission).

. The majority asserts:
[B]efore 1980, which was well after the FRA took its present form, all depositions had to be filed. See, e.g., Fed.R.Civ.P. 30(f) (1970) (“[The officer before whom the deposition was taken] shall then securely seal the deposition in an envelope indorsed with the title of the action ... and shall promptly file it with the court ....”) .... Given that every deposition in a federal suit was a record subject to the FRA before 1980, it should not be cause for great concern about the impact on discovery if some depositions still are.
Maj. Op. at 1319-20 (additional citations omitted). The majority fails to recognize that before the filing required by the 1970 version of Rule 30(f), depositions had to be "fully transcribed,” “submitted to the witness for examination,” and "then be signed by the witness [or the officer before whom the deposition was taken, in certain circumstances].” Fed.R.Civ.P. 30(e) (1970); see also Fed.R.Civ.P. 30(e) (1979) (same); Fed.R.Civ.P. 30(e) (1950) (same). The deposition transcripts at issue in this case were never signed, and the record is disputed as to how many depositions, if any, were even transcribed. It is apparent that the Federal Rules have always prohibited filing unsigned depositions, such as those at issue in this case.

. See, e.g., National Archives, Archival Research Catalog, http://arcweb.archives.gov/ (search "Stowe and Thomas”) (last visited Oct. 10, 2008) (noting that "[t]he case file from which these documents originate is also referenced as Stowe versus Thomas, Case # 9 October Session 1853” (emphasis added)).